## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-21590-BLOOM/Otazo-Reyes

LOURDES GONZALEZ,

      Plaintiff,

v.

SPITZER AUTOWORLD HOMESTEAD, INC.,

      Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant Spitzer Autoworld Homestead, Inc.'s ("Spitzer Autoworld") Motion for Summary Judgment. ECF No. [22] ("Motion"). Spitzer Autoworld filed a Statement of Material Facts, ECF No. [21] ("SMF"), and a Notice of Filing Supplemental Exhibits to Defendant's Statement of Material Facts together with supplemental exhibits, ECF No. [26], in support of its Motion. Plaintiff Lourdes Gonzalez ("Gonzalez") filed a Response in Opposition to the Motion, ECF No. [31], and a Response to Defendant's Statement of Material Facts and Statement of Additional Material Facts, ECF No. [30]. Spitzer Autoworld filed a Reply, ECF No. [36], and a Reply Statement of Material Facts, ECF No. [37]. The Court has carefully considered the Motion, the Response, the Reply, the associated Statements of Material Facts, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, Spitzer Autoworld's Motion is denied.

**TABLE OF CONTENTS**

I.     BACKGROUND AND MATERIAL FACTS................................................................ 3

   A.   Defendant's Motion ............................................................................................. 4

   B.   Material Facts ...................................................................................................... 5

      1.   Spitzer Autoworld Hires and Onboards Gonzalez ...................................... 5

         a.   Hiring Process ....................................................................................... 5

         b.   The Scope of Gonzalez's Employment from July 21, 2020 to November 5, 2020 .. 6

      2.   Prohias' Conduct Toward Gonzalez ........................................................... 7

      3.   Spitzer Autoworld's Response to the September 22, 2020 Incident ........................... 9

         a.   Spitzer Autoworld's Investigation ....................................................... 9

         b.   Gonzalez's "new Direct-Report Supervisor" on October 9, 2020 ........................ 11

      4.   Reports of Gonzalez's Performance at Spitzer Autoworld ...................... 13

      5.   Gonzalez's Foot Injury ............................................................................. 17

      6.   Termination of Gonzalez's Employment on November 5, 2020.............................. 18

II.    LEGAL STANDARD.............................................................................................. 18

III.   DISCUSSION ........................................................................................................ 19

   A.   Counts II and V: Supervisor Harassment which Culminates in an Adverse Tangible Employment Action .................................................................................... 20

   B.   Counts III, VI, and IX: Retaliation in Violation of Title VII, the FCRA, and the ADA .. 27

      1.   Plaintiff's *Prima Facie* Case ..................................................................... 28

         a.   Count IX.............................................................................................. 28

         b.   Counts III and IV ................................................................................ 30

      2.   Legitimate Non-Discriminatory Reason for Termination .......................... 30

      3.   Pretext ....................................................................................................... 31

   C.   Counts I and IV: Hostile Work Environment ................................................... 33

   D.   Counts I and IV: *Faragher/Ellerth* Affirmative Defense ................................. 36

      1.   Reasonable Steps both to Prevent Sexual Harassment and to Remedy the Sexually Harassing Conduct Promptly Once It Was Brought to the Employer's Attention ............. 36

         a.   Reasonable Steps to Prevent Sexual Harassment .................................. 36

         b.   Reasonable Steps to Remedy the Sexually Harassing Conduct............................ 38

      2.   Unreasonable Failure to Avoid Harm or Utilize any Remedial Opportunities Made Available by the Employer ....................................................................... 39

   E.   Count VII: Discrimination in Violation of the Americans with Disabilities Act ............. 39

      1.   Plaintiff's *Prima Facie* Case ..................................................................... 40

      2.   Legitimate Non-Discriminatory Reason for Termination .......................... 43

3.    Pretext.................................................................................................. 44

F.    Count VIII: Failure to Accommodate ........................................................ 44

IV.    Conclusion .............................................................................................. 45

## I.    BACKGROUND AND MATERIAL FACTS

This action concerns allegations of sexual harassment and discrimination on the basis of Plaintiff's disability. The Court restates the allegations set forth in Gonzalez's May 23, 2022 Complaint against Spitzer Autoworld, which seeks monetary damages, costs, and reasonable attorney's fees. ECF No. [1] ¶ 1. Spitzer Autoworld hired Gonzalez, a woman, on or about June 22, 2020. *Id.* ¶¶ 18-19. Gonzalez's supervisor, Robert Prohias ("Prohias"), made unwanted sexual advances towards her, which she refused. *Id.* ¶¶ 20-21. On September 22, 2020, Prohias grabbed Plaintiff's left arm and pulled her towards him, bit her breast, and grabbed her buttocks. *Id.* ¶ 22. Gonzalez reported Prohias' conduct to Spitzer Autoworld's Human Resources personnel, who took no corrective action and forced Gonzalez to endure a "hostile work environment." *Id.* ¶¶ 23-24. Gonzalez thereafter reported Prohias' conduct to the Miami-Dade Police Department on October 3, 2020. *Id.* ¶ 25. Around this time, Gonzalez sustained fractures to her 2nd and 3rd metatarsals and a Lisfranc fracture. ¶ 26. These physical impairments substantially limited her ability to walk. *Id.* ¶ 26. On November 4, 2020, Gonzalez requested a two-week leave of absence. *Id.* ¶ 28. Spitzer Autoworld terminated Gonzalez that same day. *Id.* ¶ 29.

Gonzalez seeks relief for the following claims:

1.    Count I – Discrimination Because of Sex in Violation of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 *et seq.* ("FCRA") (for a hostile work environment);

2.    Count II – Discrimination Because of Sex in Violation of the FCRA (for an adverse tangible employment action);

3.    Count III – Retaliation in Violation of the FCRA;

4. Count IV – Discrimination Because of Sex in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (for a hostile work environment);

5. Count V – Discrimination Because of Sex in Violation of Title VII (for an adverse tangible employment action);

6. Count VI – Retaliation in Violation of Title VII;

7. Count VII – Discrimination in Violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA");

8. Count VIII – Failure to Accommodate in Violation of the ADA; and

9. Count IX – Retaliation in Violation of the ADA.

**A. Defendant's Motion**

In its Motion, Spitzer Autoworld makes six primary arguments for summary judgment. *First*, Summary judgment is warranted on Counts II and V because there is no causal link connecting Prohias' unwelcome sexual advanced with Spitzer Autoworld's termination of Gonzalez's employment. *See generally* ECF No. [22]. *Second*, summary judgment is warranted on Counts III, VI, and IX because evidence that the Dealership fired Gonzalez for poor work performance negates any inference of retaliation. *Third*, summary judgment is warranted on Counts I and IV because Gonzalez cannot demonstrate a hostile work environment. *Fourth*, summary judgment is warranted on Counts I and IV because Spitzer Autoworld has established the defense described in the U.S. Supreme Court's decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). *Fifth*, summary judgment is warranted on Count VII because Gonzalez fails to carry her burden to prove discrimination under the burden-shifting framework set forth in the U.S. Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Finally*, summary judgment on Count

VIII is warranted because Gonzalez is not disabled and, alternatively, Spitzer Autoworld did not know of Gonzalez's purported disability.

The Court addresses Defendant's arguments, together with Plaintiff's responses, in the Discussion section below.

### B. Material Facts

Based on the parties' Statements, Counterstatements, Reply Statements of Material Facts, and evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### 1. Spitzer Autoworld Hires and Onboards Gonzalez

#### a. *Hiring Process*

On June 22, 2020, Spitzer Autoworld hired Gonzalez to work as a Title Clerk in its office in Florida. SMF ¶ 2; CSMF ¶ 2; *see also* Dep. of Allen Yakich ("Yakich Dep.") at 6:11-14, ECF No. [26-3].[1] Linda Thompson ("Thompson"), Defendant's Human Resources Director,[2] testified that the Defendant provides new employees with "a sexual harassment [prevention] training video" and administers a quiz to "every new hire." ECF No. [21-3] at 31:12-22. Thompson was responsible for investigating complaints of discrimination or harassment in Defendant's workplace during the period of Gonzalez's employment. *Id.* at 7:6-10. Defendant has a written policy regarding how to report sexual harassment and Gonzalez received a copy of the policy. *Id.*; *see also* ECF No. [21-2] at 1 ("Non-Discrimination Policy"). Gonzalez had previously acknowledged receipt of Spitzer Autoworld's organizational policy forms, including the Non-Discrimination Policy,[3] and agreed to Defendant's policies on June 19, 2022. ECF No. [21-4]. On June 22, 2023,

---

[1] When citing to deposition transcripts, the Court uses the pagination indicated on the transcript. Otherwise, the Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[2] Linda Thompson Dep. Tr. ("Thompson Dep.") at 4:2-24, ECF No. [21-3].

[3] ECF No. [21-4] lists an "Anti Harassment Policy," which the Court construes as including the Non-Discrimination Policy considering the parties' statements of material fact. SMF ¶ 4; CSM ¶ 4.

Case No. 22-cv-21590-BLOOM/Otazo-Reyes

Gonzalez completed "Harassment [Prevention] Training." SMF ¶ 5; CSMF ¶ 5. That same day, Gonzalez completed a "Respect in the Dealership Follow-up Quiz" regarding Defendant's policy on sexual harassment and other discriminatory harassment. ECF No. [21-6]. Gonzalez signed the following acknowledgement:

> I understand it is my obligation to read and comply with the policies and provisions contained within the handbook. I further understand that if I have any questions about the policy or complaints of wrongdoing, it is my responsibility to contact my supervisor or any member of management with whom I feel comfortable.

*Id.*

### b. *The Scope of Gonzalez's Employment from July 21, 2020 to November 5, 2020*

The record shows that the following are "ESSENTIAL JOB FUNCTION[S] AND RESPONSIBILITIES" for a Title Clerk:

- Prepares tax and title documents and submits to state authorities
- Verifies payoffs on trade, and send[s] payoffs/collects titles
- Compiles and maintains a complete list of title work still pending. . . .
- Processes titles for auctions sales, and then post [sic] receipt checks
- Assists the sales and finance departments in making sure paperwork runs smoothly
- Handle[s] customer and dealership inquiries regarding tag and title issues
- . . .
- Other assigned tasks and duties

ECF No. [21-9].

On July 21, 2020, Gonzalez became Defendant's Office Manager. SMF ¶ 8; CSMF ¶ 8. Gonzalez's compensation changed from a $14 hourly rate to a $2,800 monthly rate, and she was given a $400 monthly car allowance "in lieu of demo," i.e., instead of having use of a company car. ECF No. [21-7]. Gonzalez's job responsibilities included "processing car titles," Manufacturer's Statements of Origin ("MSOs"), car registrations, and making daily bank deposits. SMF ¶ 9; CSMF ¶ 9. Many of Gonzalez's job responsibilities, including the processing of car

titles, MSOs, and car registrations, remained the same as when she was a Title Clerk. SMF ¶ 9; CSMF ¶ 9.

### 2. Prohias' Conduct Toward Gonzalez

Upon commencing employment, Defendant's General Manager was Robert Prohias ("Prohias"), and he was Gonzalez's direct supervisor. SMF ¶ 11; CSMF ¶ 11.[4] Gonzalez testified that Prohias began to "ask[] her out" "[n]ot even a week after" she started working at Spitzer Autoworld (SMF ¶ 12; CSMF ¶ 12) and that Prohias continued to ask her out "almost every single day." Dep. of Lourdes Gonzalez ("Gonzalez Dep.") at 22:17-18, 22:21-23:8, ECF No. [26-1]. Gonzalez "kept telling [Prohias] no," and "figured [Prohias] would leave [her] alone." *Id.* at 23:3-8. Gonzalez did not report Prohias's conduct before September 2020. *Id.* at 22:24-23:8, 26:2-5.

On September 23, 2020, at 1:30 p.m., Gonzalez called Thompson and Katrina Modin, a Human Resources Generalist. SMF ¶ 14; CSMF ¶ 14. Gonzalez reported the following:

> I was in my office at the cashier window doing a couple of stuff together [sic] and [Prohias] walked into my office. And sat in my desk on my chair. And that's when he asked me to come over to him, which I said no. And he's like, come here, I just want to tell you something. I don't remember what he was wanting to tell me. I just approached him. I didn't get too close. And he reached over with his right hand and pulled my left arm towards him. And that's when he went to go bite my left breast, but I moved and he ended up biting my right boob. And then he grabbed my butt and slapped it several times. I pulled away from him, but he was holding me tight.

Gonzalez Dep. at 27:3-15; *see also* ECF No. [21-10] at 1.

Handwritten notes in the record contain the following statements:

> Re: Lourdes
> Happen [sic] by herself.
> 9/22/2020 Chit chat flirting Bit tit and grabbed her ass
> Previously touched her hand – calls her baby
> He said had a dream about her told her to go there
> . . .

---

[4] General Managers report to Andrew Spitzer, the Chief Operating Officer at Spitzer Autoworld ("COO"). Dep. of Andrew Spitzer ("Spitzer Dep.") at 9:25-10:1, ECF No. [26-2].

> Robert yelled @ Lourdes about phones You don't tell anyone from Ohio whats [sic] going on here. He says Ohio thinks you are negative
> . . .
> Robert asked L when are we going to a couples massage – she didn't know what it was. He said it more than once.
> . . .
> Yesterday "Don't do that"
> Robert said – Would she allow him to take her and her daughter to Key Largo for the weekend.
> . . .
> She feels he will come after her when he finds she reported
> . . .
> She is alone – Camera need to be installed in office.
> . . .
> 9/22 Phil told Kelly that [Gonzalez] is Bitchy

ECF No. [21-10] at 3-6, 8.

Regarding her communications with Prohias following the September 23, 2020 incident, Gonzalez testified:

> Q. Did you speak with Mr. Prohias after you went back to work?
> A. I don't remember. Obviously, I'm pretty sure I did because he had -- he worked there. I had no other choice. He was my boss.
> Q. Did Mr. Prohias, ever ask you out again after this incident?
> A. He kept on mentioning, yes.
> Q. Okay. How often would he continue asking you out?
> A. I don't remember.
> Q. But you do remember him asking you out?
> A. He continuously would ask me out.

Gonzalez Dep. at 34:14-25.

On October 14, 2020, Thompson explained to Gonzalez that she "will be responsible for: . . . Completing daily cash, check and credit card deposits and driving cash deposits to the bank daily (company vehicle will be provided, the only destination will be the bank and back to [Spitzer Autoworld])." ECF No. [21-8]. On October 26, 2020, Yakich wrote to Spitzer and CFO Joe Mastrodonato:

> [Gonzalez] is ready to take the deposit and [Prohias] has told Marko to tell her that only Robert can give her a key to a vehicle. Robert is not there[.] I know that he does not want to . . . [.] It does not look good that we put something in [writing] and are now changing the process on [Gonzalez].

ECF No. [30-3]. Later that day, Yakich wrote: "[Gonzalez] is no longer able to use a company vehicle to take [sic] deposit to [sic] bank[.] I guess she has a vehicle allowance as part of her pay plan so Robert told joe [sic] and Andrew he does not want to give her use of vehicles and they agreed[.]" ECF No. [30-4].

### 3. Spitzer Autoworld's Response to the September 22, 2020 Incident

#### a. *Spitzer Autoworld's Investigation*

Thompson's September 23, 2020 notes reflect that Thompson communicated Gonzalez's report directly to Spitzer and Mastrodonato at 3:00 p.m. and 4:00 p.m., respectively. ECF No. [21-10] at 1. On September 24, 2023, Thompson emailed Spitzer with questions and talking points in preparation for his interview of Prohias. ECF No. [21-11] at 1-2.[5] Spitzer testified that it is the Defendant's policy or procedure for supervisors of an employee who is alleged to have discriminated or harassed other employees to interview the allegedly harassing employee, and in this case, Spitzer Autoworld's policy or procedure dictated that Andrew Spitzer would interview Prohias. Spitzer Dep. at 10:23-11:5. Accordingly, Thompson recommended that Spitzer ask Prohias the following questions:

> Have you called anyone baby, sista or negrita?
> Have you touched anyone in an unprofessional way? On the hand or other part
> of the body [sic]
> Have your [sic] told anyone that you would take it outside and punch them in
> the face?

---

[5] Gonzalez contends that certain documents referred to in Defendant's Statement of Material Facts are "inadmissible at trial" because Defendant has offered no foundation for the documents' admission under an exception to the rule against hearsay. In addition, Defendant has failed to authenticate the documents or provide notice of intent to rely on the documents as self-authenticating. However, those contentions do not preclude the Court from considering the documents in addressing the Defendant's Motion. Gonzalez's argument that the Court may not consider inadmissible hearsay in ruling on the Motion is without merit. Although it is true that "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment," *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999), a district court may nevertheless "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012), and Gonzalez does not explain why the statements are not reducible to admissible evidence.

Have you invited any of the staff to go on a getaway with you for the weekend?
Have you made advances toward any employee of [Spitzer Autoworld]?
Do you feel you are prejudice [sic] of any class of people?
Have you told employees they would lose their job [sic] if they spoke to people from Ohio about any issues in the store?
How would you differentiate bullying vs. holding people accountable?
The allegations are 1. you touched a female employee in a sexual manner, 2. you have threatened violence more than 1 time with 2 previous employees, 3. You have bullied and retaliated against employees when they did or said something you didn't agree with.
If [sic] claims they are not true ask "why do you think someone would make these allegations?"
What is your response to these allegations?

ECF No. [21-11].

Thompson also recommended that Spitzer communicate the following talking points:

[Prohias] must not:
2. Must not touch with, flirt with, invite our or speak to in any sexual manner any employee of [Spitzer Autoworld]
. . .
5. Must not interrogate, survey or quiz employees about this conversation.
. . .
[Prohias] must:
1. Treat all ethnicities fairly and equally according [sic] the Title VII federal guideline.
2. Be professional and respectful to all gender regardless of persuasion.
3. Follow our policies and federal employment guidelines.

*Id.* at 2.

Thompson suggested that "[a]fter the talk on the phone, I want you to compose an email to document the conversation and send it to me." *Id.* Spitzer replied to Thompson on September 25, 2020, explaining that he spoke with Prohias. *Id.* at 1. Spitzer wrote that he and Prohias "reviewed each question [Thompson] suggested [Spitzer] cover with [Prohias]." *Id.* Prohias "vehemently denied all concerns regarding sexual harassment, racial profiling, and threatening peoples [sic] jobs at the idea of reaching out of [sic] HR or Spitzer MGMT." *Id.* Spitzer wrote that he and Prohias reviewed "each of the numbered talking points . . . so as there is no misunderstanding of what is to be expected of [Prohias] and his staff." *Id.* Spitzer wrote that he and Prohias must

immediately "get a camera in the office so as to provide future documentation of any events," and that "[d]uring the interim, [Prohias] suggested having a third party present with him any time he does have to go into the office." *Id.* Spitzer wrote that Prohias "knows he is to keep our conversation confidential and he gave me his word that it will stay between us and himself." *Id.*

Thompson stated "[a]lthough I was unable to substantiate [Gonzalez's] allegations, I asked Prohias to take leave, and Andrew Spitzer and I decided to put a security camera in the office where Gonzalez said the incident took place, instituted a 'buddy system' so that male employees would not be in the office alone with Gonzalez." Thompson Decl. ¶ 8, ECF No. [21-12].

Thompson testified that she spoke with Tammy Lowe and Kelly Harrington and did not "find anything that would corroborate or back up the complaints that [Gonzalez] made." Thompson Dep. at 33:23-34:15. Thompson testified that the Defendant instituted a "buddy system" and installed cameras for Gonzalez's safety following Gonzalez's complaint. *Id.* at 20:4-12. The parties dispute whether the "buddy system" was instituted for Gonzalez's benefit. SMF ¶ 27; CSMF ¶ 27. Thompson testified that neither Gonzalez nor "anyone else" previously made any complaints about Prohias. Thompson Decl. at 32:10-14. Thompson testified that she "spoke almost daily" with Gonzalez after the initial complaint and that Gonzalez did not complain about being harassed further after September 23, 2020. *Id.* at 31:23-32:9. When asked, "[a]re you aware of any other complaint that the plaintiff made against Robert Prohias," Thompson testified, "[Gonzalez] complained about everything." Thompson Dep. at 20:25-21:4.

### b. Gonzalez's "new Direct-Report Supervisor" on October 9, 2020

Thompson assigned Allen Yakich ("Yakich") to be her "new direct-report supervisor." Thompson Decl. ¶ 8, ECF No. [21-12]. Yakich was the "Central Ohio Office Manager of the consolidated offices" at the time that Thompson assigned Yakich as Gonzalez's direct supervisor. Dep. of Allen Yakich ("Yakich Dep.") at 4:19-23, ECF No. [26-3]. Thompson explained to

Gonzalez that Yakich "will be the new supervisor effective 10/9/2020." ECF No. [21-15]. Yakich "will be responsible for setting expectations and measuring performance. Questions about Time and Attendance, daily work tasks, and workflow questions should be directed to [Yakich]." *Id.* The record reflects that Yakich was in Ohio during this time. Yakich Dep. at 4:19-23, 6:1-4. Gonzalez testified that she did not know if they removed Prohias from his role as her direct supervisor, and that "[a]ll they e-mailed me was my new duties and who I report to. That's it. But they still stated he was a general manager [and] that I still had to do what he asked." Gonzalez Dep. at 73:7-16.

Yakich testified that he spoke to Gonzalez "[p]robably pretty much daily" and gave her "some direction on what she should be doing every day." Yakich Dep. at 11:10-16. What Gonzalez "should be doing" included the following:

> Kind of come in the morning, you should probably do this, do that, daily deposit needs to be done, issues that might arise, missing anything to do her job. She probably would e-mail someone in the dealership saying, Hey, these things, I need these things in order to finish whatever tasks needs [sic] to be done for today.

*Id.* at 11:16-22.

Gonzalez testified, "I still had to report stuff to [Prohias] because he was the general manager. They just kept on saying he's the general manager." Gonzalez Dep. at 44:5-7. In response to the question "who would you report — or what items or thing would you report to [Prohias]," Gonzalez testified, "[w]hatever he asked, whatever he needed and called me for I had to do it because he's the general manager." *Id.* at 44:8-11.

On October 14, 2020, Gonzalez told Thompson that "she wants absolutely no contact with [Prohias], no emails, and she doesn't want to see him or be in his presence." ECF No. [21-13]. Thompson replied that "it wasn't possible to keep them separated if [Gonzalez and Prohias are] both working in the same dealership. . . [Prohias] was the general manager of the store, and if

[Gonzalez is] the office manager, they have to communicate for business purposes." Thompson Dep. at 21:25-22:7.

Yakich testified that "one of the biggest conversations I had to continue to have with [Gonzalez], the importance of cash being left in the dealership. Kind of a priority, that whoever is in the office had to get those deposits to the bank daily." Yakich Decl. at 11:23-12:8. When asked whether he was part of making the decision to terminate Gonzalez's employment, Yakich testified that he had a discussion with Thompson in which he expressed that Gonzalez "just didn't see the importance of what I thought was more important . . . getting those deposits to the bank and . . . following up on the titles and keep[ing] customer problems down to a minimum." *Id.* at 12:22-13:8.

### 4. Reports of Gonzalez's Performance at Spitzer Autoworld

The record contains seventeen (17) emails or email threads from October 1, 2020 through November 5, 2020 that detail several of her coworker's complaints against her. *See generally* ECF No. [21-16]. In 16 of these emails, Prohias' name is listed either on the From, To, or Courtesy Copy lines of those emails. *Id.*

On October 1, 2020, one employee, Philip Albanese ("Albanese"), emailed Prohias stating that "[t]his message is intended to document today's incident with Lourdes Gonzalez." ECF No. [21-16] at 1. Another email from an employee to Prohias that was dated October 2, 2020 indicates that it was written following a conversation between that employee and Prohias. *See, e.g.*, *id.* at 2 ("As per our conversation, I will try to describe as best as I can my communications with Lourdes for the past few weeks."). Prohias forwarded this email to Thompson, writing, "FYI, as per your request." *Id.*

In another email, dated October 6, 2020, a Spitzer Autoworld employee stated that Prohias had requested that the employee make a complaint against Gonzalez in writing. ECF No. [21-16]

at 5 ("G/Morning Mr. Robert Prohias as you asked me to please make a statement on what happened Thursday October first after we were done with the Dodge Chrysler Jeep rebates & incentives for the month of October.")

The record emails generally describe other employees' impressions of Gonzalez's competence and professional bearing. *See. e.g.*, *id.* at 1-3, 12. The record shows that Thompson discussed those complaints with Gonzalez on or around October 13, 2020. *Id.* at 8. In one email, dated October 14, 2020, a coworker of Gonzalez wrote to Prohias, observing that Gonzalez refused to assist a customer at Spitzer Autoworld who sought to pay a $600.00 service bill. *Id.* at 9.

The record contains a document titled SPITZER WRITTEN WARNING NOTICE describing a counseling of Gonzalez by Yakich on November 3, 2020. ECF No. [21-17] ("Written Warning"). The Written Warning states the following:

> Since her start date of 6/22/2020 there have been several instances reported by various dealership employees. Verbal rudeness to customers in the cashier window. Verbal rude responses to requests for keys/documents. Expressing her frustration and emotions in an unprofessional manner which is making others uncomfortable. This also makes others not want to work or communicate with her. There should not be terms of endearment or other pet names used when speaking to others. This is hindering the operations of the dealership.

*Id.* The Written Warning continues, "[i]f your performance / behavior does not improve or you fail to comply with any company policies, it will be necessary to take appropriate action which may include termination of employment." *Id.*

The record also reflects concerns at Spitzer Autoworld about unprocessed or improperly processed "deals," checks, and MSOs during October 2020. On October 6, 2020, John Gorski, a Spitzer Autoworld employee at the Homestead office, emailed Prohias regarding the "Terry Parks deal" being missing. ECF No. [21-16] at 4. Gorski explained that the Terry Parks deal "was located by [Gonzalez] in the locked drawer of the funding deals. We had to track the deal with Fed x.

Chrysler did find it and now is in pending status." *Id.* Prohias forwarded Gorski's email to Thompson. *Id.*

On October 14, 2020, Lough emailed Spitzer, Mastrodonato, Thompson, and Prohias, attaching "a picture of the stack of deals that [Gonzalez] says [sic] need caught up on title work." *Id.* at 9. Lough wrote that she noticed that a stack of MSOs "does not in any way equate to the amount of cars on our lot."

On October 20, 2020, Lough emailed the following to Andrew Spitzer, Mastodonato, Thompson, and Prohias: "I found in the bottom of a drawer a stack of payable folders, checks, and bills. Some of the checks were signed and ready to be mailed some where [sic] not. Briefly looking through everything, it looks like someone tried to start posting and paying but never finished." *Id.* at 10. Lough continued, "I also found a check from another dealership that we dealer trade with. The check in question is one that when I called them they had to stop payment on and reissue the check, when we had it all along." *Id.*

On October 22, 2020, Juan Prohias, an employee at the Homestead office, wrote to Robert Prohias, "attached you will find an invoice dated October 17 for an FCA return of $15980.40. Such invoice was found in the middle of a large stack of invoices to be filed. This invoice has not been closed but was placed on the stack of closed invoices." *Id.* at 11.

On October 29, 2020, Andres Saldana, another employee at the Homestead office, wrote to Prohias, "I just received a phone call from Naples CDJR letting me know that we sent the back of [sic] MSO empty. Dealership will overnight today for us to fill it up and resend overnight as well." *Id.* at 12.

Thompson testified that the Defendant "became very aware of some very severe issues regarding cash deposits and several titles that had not been processed appropriately, which would have led to financial hardship for our customers and the dealership." *Id.* at 25:7-13.

The record shows that on November 4, 2020 at 3:51 p.m., Albanese wrote the following to Lough, Thompson and Prohias: "[t]his is for reference and related to my email this morning. The loan officer at the credit union reached out to me (my assumption is that [Gonzalez] asked this person to do this)." ECF No. [21-16] at 19. The loan officer wrote to Albanese that his credit union funded a vehicle purchase on October 9, 2020 but the lien on the vehicle had not yet been perfected as of November 4, 2020. *Id.*

On November 4, 2020, at 4:25 p.m., Prohias wrote to Thompson—courtesy copying Yakich—regarding a list of pending titles from the Defendant's main wholesaler that are "outstanding for payment." *Id.* at 14; *see also id.* at 15-16. Prohias explained that the Defendant continued to possess the title to one of the vehicles Defendant sold to the wholesaler back in June 2020 and, as a result, the Defendant had not been able to "collect [the Defendant's] money." *Id.* at 14. Prohias further wrote, "[t]oday we also received a call from Planet Dodge requesting an MSO that they paid for on September 11, 2020 and they still haven't received an MSO. Tiffany, Elvia and Jessica looked for the MSO in the back office and were not able to find it." *Id.*; *see also id.* at 23.

That same day, at 4:40 p.m., Albanese wrote to Prohias:

> I have attached the check for a deal we delivered on Monday afternoon. The client asked that we process the check the following day . . . . I was under the impression that [Gonzalez] was going to deposit the check at some point after the client went to retrieve her receipt from the cashier. The check in question is the same one Lourdes spoke with Alex and Tammy about verifying with UTA. The deal is funded and Tiffany just now found the check in the deposit bag in our accounting/title department.

*Id.* at 17-18. At 9:32 p.m., an employee of Westlake Financial forwarded to Kelley Harrington a Notice of Breach of Warranties and Repurchase Demand regarding a Retail Installment Contract dated September 3, 2020. *Id.* at 24-26.

Harrington forwarded the Notice to Prohias on November 5, 2020, explaining, "I received this letter from Westlake. We have to provide titles within 30 days per our dealer agreement! Can we please process this ASAP?! If we do not give them the valid title, they are requiring us to buy back the loan by 11/11/20?!" *Id.* at 24. Yakich forwarded Harrington's email to Thompson, adding, "[a]dd to [Gonzalez] file please [a]s part reason." *Id.*

### 5. Gonzalez's Foot Injury

On November 2, 2020, Gonzalez wrote to Yakich: "[p]lease see attached Doctor note and paperwork for being late today (11/02/2020). I do have an appointment [on November 4, 2020] at 1PM." ECF No. [21-20]. Yakich forwarded the email to Thompson, along with the attachment, writing, "FOR HER FILE." *Id.*

A Clinical Note on the record dated November 4, 2020 shows that Francis Woedje Wodie DPM provided treatment to Gonzalez. ECF No. [30-10] at 2. The Clinical Note states that Gonzalez tripped, injuring her 3rd toe, and "she did not feel pain at the moment" at first but later felt pain that grew worse, so she went to an emergency department where she underwent an x-ray examination. *Id.* Gonzalez had been told she had a fracture, was placed in a splint, and instructed to see a specialist. *Id.* The Clinical Note further states the following:

> MUSCULOSKELETAL EXAM: Pain evident with palpation of the right midfoot and distal 3rd digit. [] Pain with ROM to right MTJ and digits. . . . suspected 2nd, 3rd met base fracture, right[,] suspected lisfranc injury, right[.] Bone contusion, RIGHT 3rd digit DIPL[.]
> Plan: . . .
> Unna boot applied
> Recommend patient be minimal WB in unna boot, posterior splint and with crutches

*Id.*

The record includes a signed document with a logo for an entity called Southernmost Foot & Ankle Specialists. ECF No. [21-21]. The Clinical Note explains that Gonzalez was seen on November 4, 2020 and calls for "[l]imited duty restrictions of: unable to return to work due to right 2nd, 3rd metatarsal fractures and Lisfranc injury[.]" *Id.* The Clinical Note specifies November 17, 2020 as the date on which Gonzalez may return to work. *Id.*

**6.  Termination of Gonzalez's Employment on November 5, 2020**

The record includes an HR Separation Form stating that Gonzalez was involuntarily separated from her employment for "PERFORMANCE" by "AYAKICH." ECF No. [30-1] at 1. The form identifies "RPROHIAS" as the General Manager. *Id.* A field titled "Event Details" contains the following statement: "Job performance and negative [sic] verbal conduct." *Id.* Thompson and Yakich informed Gonzalez of the termination by phone on November 5, 2020. ECF No. [21-19] at 2.

## II.    LEGAL STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably

find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## III.   DISCUSSION

Spitzer Autoworld advances six primary arguments in support of its Motion. *First*, Spitzer Autoworld contends that summary judgment is warranted as to Count II under the FRCA and Count V under Title VII. Defendant argues there is no evidence that Prohias's sex-based harassment caused Gonzalez's firing, as required to prove a Title VII violation on the basis of sex on an adverse tangible employment action. *Second*, Spitzer Autoworld contends that summary judgment is warranted on Count III under the FRCA, Count VI under Title VII, and Count IX

Case No. 22-cv-21590-BLOOM/Otazo-Reyes

under the ADA. Defendant argues that Gonzalez cannot prove that Spitzer Autoworld retaliated against Gonzalez for filing a sexual harassment complaint, or for requesting an accommodation for her injured foot, because—even if Gonzalez can make out a *prima facie* case of retaliation—Spitzer Autoworld had legitimate and non-discriminatory reasons to fire Gonzalez and Gonzalez cannot show those reasons were pretextual. *Third*, Spitzer Autoworld argues Prohias's misconduct did not rise to the level of "altering the terms and conditions of Gonzalez's employment" to sustain her hostile work environment claims (Counts I and IV). *Fourth*, Spitzer Autoworld asserts it has established the *Faragher/Ellerth* affirmative defense because Gonzalez suffered no adverse tangible employment action on account of sexual harassment, Spitzer Autoworld took reasonable steps both to prevent harassment and to remedy sexual harassment once it was brought to its attention, and Gonzalez failed to avail herself of any remedial opportunities offered by Spitzer Autoworld. *Fifth*, Spitzer Autoworld contends Gonzalez fails to make out a *prima facie* case of discrimination on the basis of disability because she was not disabled, and in any event Spitzer Autoworld had legitimate, non-discriminatory and non-pretextual reasons for firing her, warranting summary judgment on Count VII. *Finally*, Spitzer Autoworld argues that summary judgment is warranted on Count VIII for failure to accommodate Gonzalez's disability because she was not disabled. The Court addresses each argument in turn.

## A. Counts II and V: Supervisor Harassment which Culminates in an Adverse Tangible Employment Action

Title VII makes it unlawful for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[6]

---

[6] "Because the [Florida Civil Rights Act] is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law claims do not need separate discussion and their outcome is the same as the federal ones." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010) (internal citation omitted).

Where a plaintiff seeks to hold an employer vicariously liable for sexual harassment by the plaintiff's work supervisor, the Eleventh Circuit has explained that a plaintiff asserting a Title VII claim must show "(1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists" in order to prove sexual harassment. *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)); *see also Chavez v. Sky Fla. Servs., LLC*, No. 21-23439-CIV, 2022 WL 4285596, at *6 (S.D. Fla. Aug. 19, 2022) (quoting *Hulsey*, 367 F.3d at 1246) ("When we talk about tangible employment action and hostile environment, what we are or should be talking about are the two alternative ways a plaintiff may establish a basis for the employer's vicarious liability[.]").

The Eleventh Circuit divides cases where an employee sues an employer under Title VII specifically for a supervisor's sex-based harassment into two categories. In the first category, an employer may be held liable if "the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her." *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753-54, (1998)). Summary judgment is warranted in favor of the employer where a plaintiff fails to present sufficient evidence establishing a causal link between the adverse tangible employment action and

the harassment. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001) (holding that plaintiff failed to show causal link).

In the second category of cases, a plaintiff must show that the supervisor's harassment was "sufficiently severe and pervasive to effectively result in a change . . . in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned." *Id.* This is referred to as hostile work environment harassment. *Id.*; *see also Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)) ("A hostile work environment claim under Title VII requires proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").

Spitzer Autoworld argues that summary judgment is warranted on Counts II and IV because Gonzalez cannot show—as she is required to—that the adverse tangible employment action that occurred here, her termination, was caused by Prohias's unwanted sexual advances. Specifically, Defendant asserts it has presented unrebutted evidence that Prohias was not Gonzalez's supervisor at the time of Gonzalez's employment termination, Prohias was not involved with the decision to fire Gonzalez, and Gonzalez's termination was due to her deficient work performance. ECF No. [22] at 4-5. Plaintiff responds that Prohias caused an adverse tangible employment action in the form of loss of access to a company car and he "was a part of the decision to terminate Plaintiff and [Prohias] personally approved it." ECF No. [31] at 4. Defendant replies that Plaintiff was not given the keys to company car because she had a $400 per month transportation allowance.  ECF No. [36] at 2. The Court addresses whether evidence supports a causal connection between Prohias's unwanted sexual advances and Gonzalez's termination.

There is no question that a firing is an adverse tangible employment action. *Cotton*, 434 F.3d at 1231. The Court next addresses whether there is a genuine dispute over Prohias's status as Gonzalez's "supervisor." An employee is another's "supervisor" for the purposes of establishing vicarious liability under Title VII if "he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *see also Swindle v. Jefferson Cnty. Comm'n*, 593 F. App'x 919, 921 n.2 (11th Cir. 2014). The harassing employee need not be the victim's immediate or direct supervisor. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (quoting *Faragher*, 524 U.S. at 807) ("An employer 'is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'").

Here, Prohias's supervisory status is a question of fact because the parties dispute whether Prohias remained Gonzalez's supervisor after September 23, 2020 and the evidence supports that Prohias exercised supervisory control over Gonzalez, even after Thompson instructed Gonzalez to directly report to Yakich. *See* CSMF ¶ 34 ("Plaintiff disputes that Robert Prohias was ever removed from being her direct supervisor and Plaintiff testified that she still had to do what he asked"); RSMF ¶¶ 57 ("[d]isputed that [Prohias] was [Gonzalez's] supervisor . . . after September 23, 2020") and 60 ("Mr. Prohias remained her supervisor for only one week while transitioning, and then her direct reporting was transferred to Allen Yakich"); *see also Vance*, 570 U.S. at 444 (explaining that, when genuine factual disputes exist about an alleged harasser's authority to take tangible employment actions, those disputes are resolved at trial). First, Gonzalez testified that Prohias remained the General Manager of the Spitzer Autoworld Homestead Office and she still "had to do what he asked." Gonzalez Dep. at 73:7-16. Second, Prohias continued to exercise

control over Gonzalez's employment, indicating that Prohias retained the power to take adverse action. That control is shown by Prohias's decision to take away Gonzalez's use of a company car, and by 16 email communications between Prohias and Thompson from October 1, 2020 through November 4, 2020. demonstrating that Prohias was empowered to utilize the Human Resources department to effect Gonzalez's termination. To be sure, the record shows that Yakich submitted Gonzalez's HR Separation Form, ECF No. [30-1] at 1, and Thompson and Yakich informed Gonzalez of her termination, ECF No. [21-19] at 2. However, that evidence shows that Yakich and Thompson were involved with Gonzalez's firing but does not conclusively establish that Prohias did not have the authority to take adverse employment action against Gonzalez.

Because the Court concludes Prohias's supervisory status is a factual question, the Court finds *Vance*—the case on which Defendants rely for the proposition that Prohias was not Gonzalez's supervisor at the time of her firing—inapposite. In that case, the Supreme Court noted that the parties did not dispute that the harassing employee had the power to take adverse employment action and the evidence that the harassing employee directed the victim's "day-to-day activities" was entirely lacking. *Vance*, 570 U.S. at 450. Here, evidence supports that Prohias had the authority to direct Gonzalez's day-to-day activities. The Court thus proceeds to consider whether there is causal evidence linking Prohias' unwanted sexual advances with Gonzalez's termination.

To be sure, there is evidence to support Defendant's contention that Gonzalez was fired for her poor job performance. Gonzalez's Human Resources Separation Form states that Gonzalez's employment was terminated due to "[j]ob performance and negitive [sic] verbal conduct" on November 5, 2020. ECF No. [30-1]. Other evidence supports those reasons for the firing. Emails generally include descriptions by Gonzalez's coworkers as Gonzalez being rude both to customers

and co-workers alike, "emotional," as someone who made coworkers feel uncomfortable being around her, and as someone wont to addressing coworkers with "pet names." ECF Nos. [21-16] at 1-3, 12; [21-17]. In one specific instance, Gonzalez refused to help a customer who sought to pay a $600.00 service bill because she was on her lunch break. ECF No. [21-17] at 8. In another instance on November 4, 2020, one coworker reported being "under the impression" that Gonzalez was going to deposit a check for a deal Spitzer Autoworld delivered but he found the check in the deposit bag in Spitzer Autoworld's accounting/title department. *Id.* at 17-18. Gonzalez also appeared to be behind on her work, as evidenced by "stacks of deals" and invoices. *Id.* at 9, 11.[7]

However, and critically, Prohias was directly involved in communicating most of that evidence to the Human Resources department. In particular, Prohias forwarded the email messages to Thompson that would form the basis of Gonzalez's termination. Among the 16 above-described email threads, there are 10 emails in the record from Prohias to Thompson regarding Gonzalez's demeanor and performance. ECF No. [21-16] at 2-7, 11-14, 23. In two of those emails, Prohias prodded other employees for feedback on Gonzalez's demeanor and performance. *See, e.g.*, *id.* at 2-3 ("***As per our conversation***, I will try to describe as best as I can my communications with [Gonzalez] ***for the past few weeks***") (emphasis added), 5 ("G/Morning Mr. Robert Prohias ***as you***

---

[7] The record contains several other instances of "deals," checks, title documents, or MSOs being misplaced, and examples of title documents not being transferred to financing entities, from October through November 2020. *Id.* at 4, 10, 12, 14-16, 23-26. In the light most favorable to Gonzalez, however, such oversights do not support an inference of poor job performance. The oversights might be under Gonzalez's purview since her job responsibilities included preparing and submitting title documents, compiling and maintaining a list of title work that is pending, and "[o]ther tasks and duties," which may include making daily bank deposits. ECF No. [21-9]; SMF ¶ 9; CSMF ¶ 9. However, attributing those oversights to Gonzalez requires assuming that she was solely responsible for title document processing and making bank deposits. The record does not indicate that she was the only employee so tasked. To be sure, there is evidence that Gonzalez caused Spitzer Autoworld to default on an agreement with Westlake Financial for failure by Spitzer Autoworld to provide them with a valid title for a vehicle, which may have resulted in Spitzer Autoworld having to buy back a Westlake Financial loan. ECF No. [21-17] at 24-26. However, as the Yakich email makes clear, the decision to fire Gonzalez had already been made by the time Spitzer Autoworld learned of their default. *See id.* at 24 (explaining that the oversight should be "[a]dd[ed] to [Gonzalez] file . . . [a]s part reason").

***asked me to please make a statement on what happened*** . . . . she kept interrupting you and talking over you! It was very disrespectful on her behalf and shameful for Robert[.]").

Reporting employee performance to HR may be a responsibility of a Spitzer Autoworld General Manager. However, the record is devoid of reports of performance complaints against Gonzalez prior to the September 22, 2020 incident. That change in the frequency of complaints raises the question of why, after the September 22, 2020 incident, Prohias intervened in Gonzalez's employment by communicating her purported performance issues to Human Resources despite not ostensibly being her direct supervisor. In the light most favorable to Gonzalez, the evidence supports the inference that Prohias, feeling slighted by Gonzalez's rejection of his aggressive sexual conduct, responded by targeting her employment for termination by collecting complaints against Gonzalez and communicating those complaints to Spitzer Autoworld's Human Resources department. The record plainly supports that Prohias engaged in aggressive sexual conduct. Gonzalez's testimony, and Thompson's notes, support that Prohias asked Gonzalez out almost every day. Gonzalez Dep. at 22:17-18, 22:21-23:8. Gonzalez also describes how, on September 22, 2020, Prohias bit Gonzalez in the breast and slapped her buttocks "several times." Gonzalez Dep. at 27:3-15. Thompson's notes show that Prohias had "[p]reviously touched [Gonzalez's] hand – call[ed] her baby," told her that he had a dream about her and told her "to go there," asked about going to a couples massage, and other sordid advances. ECF No. [21-10] at 3-6, 8. Gonzalez rejected Prohias's those advances, and forty-four days later, Gonzalez was fired on the basis of complaints reported after September 22, 2020. Gonzalez Dep. at 23:3-8; *id.* at 27:3-15. Thus, a fact finder may reasonably conclude that there exists a causal link connecting Prohias's sexual harassment with Gonzalez's firing. As such, the record evidence raises a genuine dispute of material fact as to whether Prohias's harassment caused Gonzalez's firing.

Those facts distinguish this case from *Frederick*, the case on which Spitzer Autoworld relies. In *Frederick*, there was *no* evidence supporting the claim that the alleged harassment led to an adverse employment action. *Frederick*, 246 F.3d 1305, 1312 (11th Cir. 2001). That is because the defendant there presented unrebutted evidence that the plaintiff was denied a promotion due to performance issues and assessments that plaintiff "needed more development." *Id.* In contrast, the evidence here supports that Prohias weaponized complaints about Gonzalez performance issues after she rejected him. Summary judgment is therefore denied on Counts II and IV.[8]

### B. Counts III, VI, and IX: Retaliation in Violation of Title VII, the FCRA, and the ADA

Title VII's anti-retaliation provision makes it unlawful for an employer to "discriminate against any of his employees . . . because he has . . . made a charge . . . or participated in any manner in an investigation[.]" 42 U.S.C. § 2000e-3(a); *see also Furcron*, 843 F.3d at 1310. The ADA also prohibits retaliation. 42 U.S.C. § 12203(a). Retaliation claims under the ADA and the FCRA follow the analysis under Title VII and may thus be analyzed together with the Title VII retaliation claim. *Russell v. City of Tampa*, 737 F. App'x 922, 923 (11th Cir. 2018). A violation of the Title VII or ADA's anti-retaliation provision, or the FCRA, may be established by direct or circumstantial evidence. *Furcron*, 843 F.3d at 1310. Where the plaintiff's evidence is entirely circumstantial, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to retaliation claims. *Id.* The parties also agree the *McDonnell Douglas* framework applies to Plaintiff's claims. *See* ECF No. [22] at 5, 16; ECF No. [31] at 6.

---

[8] Because the Court concludes that summary judgment is not warranted on Counts II and IV because there is a dispute of fact on whether Prohias's unwanted sexual advances caused Gonzalez's firing, the Court does not reach the parties' arguments concerning Prohias's purported denial to Gonzalez of the use of a company car.

Under *McDonnell Douglas*, Plaintiff bears the burden of establishing the following elements as part of her *prima facie* case: (1) the employee was engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Id.* Once a *prima facie* case has been established, the burden shifts to the Defendant to come forward with legitimate reasons for the employment action to negate an inference of retaliation. *Id.* If the employer is able to do so, the burden shifts back to the Plaintiff to show, by a preponderance of the evidence, that the Defendant's reasons are pretextual. *Id.*

### 1. Plaintiff's *Prima Facie* Case

Here, the parties do not dispute that Gonzalez's report of sexual harassment constitutes a statutorily protected activity. *See* ECF No. [22] at 5-6; ECF No. [31] at 6. Neither does Spitzer Autoworld dispute that "requesting a reasonable accommodation" for a "broken foot" also constitutes statutorily protected activity under the ADA. As stated, there is no dispute that Gonzalez suffered an adverse tangible employment action in being fired. The Court therefore considers the parties' arguments regarding the causation prong in evaluating Gonzalez's *prima facie* showing of retaliation.

#### a. *Count IX*

To establish a causal connection between a protected activity and an adverse action, "a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)) (quotations and alterations omitted). To make this showing, a plaintiff must establish that "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Close

temporal proximity between the protected conduct and the adverse action is sufficient circumstantial evidence to create a genuine issue of material fact regarding the existence of a causal connection. *Id.* "When an employer makes a tentative decision before protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation." *O'Hara v. Univ. of W. Fla.*, 750 F. Supp. 2d 1287, 1310 (N.D. Fla. 2010), *aff'd in part*, 494 F. App'x 972 (11th Cir. 2012) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that, where an employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along the lines previously contemplated, though not yet definitively determined," did not establish evidence of causality)).

The record shows that on November 2, 2020, Gonzalez wrote to Yakich, attaching a doctor's note to her email. ECF No. [21-20]. The doctor's note calls for limited work duty restrictions because Gonzalez was "unable to return to work due to right 2nd, 3rd metatarsal fractures and Lisfranc injury[.]" ECF No. [21-21]. Gonzalez testified that the purpose of providing the note was to request two weeks off from work. Gonzalez Dep. at 56:3-8. On November 2, 2020, Yakich forwarded the email to Thompson, along with the attachment, writing, "FOR HER FILE." ECF No. [21-20]. On November 5, 2020, Spitzer Autoworld fired Gonzalez. ECF No. [21-19] at 1-2.

The foregoing shows that the decision-makers, Yakich and Thompson, became aware of the protected conduct—requesting an accommodation due to Gonzalez's injury—on November 2, 2020, before she was fired. The protected activity and the adverse action were not wholly unrelated since Gonzalez's tardiness on account of the doctor's appointment to treat her injured foot formed part of the reason for firing her. *See* ECF No. [21-20] (Yakich forwarding Gonzalez's email

attaching the doctor's note and explaining her tardiness to Thompson). As such, Gonzalez makes out the causation prong to her *prima facie* case for Count IX.

### b.  Counts III and IV

Spitzer Autoworld concedes that Gonzalez has made her *prima facie* case as to causation for Counts III and IV. *See* ECF No. [22] at 5 ("The only evidence Gonzalez has of a 'causal link' between her protected activity and the termination of her employment is proximity in time); *see also* ECF No. [36] at 3 ("The only evidence Gonzalez has of a 'causal link' between her protected activity and the termination of her employment is proximity in time."). Thus, the Court considers whether Defendant has proffered legitimate reasons for Gonzalez's firing that negate an inference of retaliation either for reporting sexual harassment or requesting an accommodation.

### 2.  Legitimate Non-Discriminatory Reason for Termination

Spitzer Autoworld contends it made the decision to terminate Gonzalez's employment before she requested an accommodation for her broken foot. ECF No. [22] at 6. Spitzer Autoworld argues that Gonzalez was legitimately fired because there were at least seven written complaints about her "rude and unhelpful behavior," and at least 10 written reports of unprocessed title paperwork and deposits not being made at a bank. *Id.* Further, Spitzer Autoworld contends Gonzalez cannot show Spitzer Autoworld's reasons for terminating her employment were pretextual. *Id.* at 6-7.

In response, Gonzalez focuses her briefing on whether Gonzalez has made out a *prima facie* case of discrimination but does not dispute whether Spitzer Autoworld can meet its burden to proffer legitimate reasons for its employment action. *See* ECF No. [31] at 8 ("Lastly, assuming, *arguendo*, that Defendant has met its burden of advancing legitimate non-discriminatory reasons for the adverse employment action, those reasons are . . . pretextual.").

As such, the Court finds the record supports that Spitzer Autoworld has offered legitimate, non-discriminatory reasons for Gonzalez's firing.

### 3. Pretext

Spitzer Autoworld contends that Gonzalez has presented no evidence of pretext. Spitzer Autoworld points to the written complaints and reports on Gonzalez's rude and unhelpful behavior, and of unprocessed titled paperwork and missed deposits.

"Because the plaintiff bears the burden of establishing pretext, [s]he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (citing *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 249-50). "When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* In opposing a motion for summary judgment, an employee may make that showing by presenting evidence that calls into question an employer's sincere belief in its proffered reasons for the employee's termination. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (finding that issue of fact precluded summary judgment as to whether employer's asserted reasons were pretextual where employee present evidence, *inter alia*, that called into question the sincerity of employer's belief in allegations of incidents of employee's unprofessionalism). Gonzalez has done so here.

As Defendant observes, Gonzalez was employed for 4 ½ months in total. ECF No. [22]. One month after beginning employment with Spitzer Autoworld, Gonzalez was promoted. SMF

Case No. 22-cv-21590-BLOOM/Otazo-Reyes

¶ 8; CSMF ¶ 8. Plaintiff's promotion supports the inference that she was performing her job competently. That inference is further supported by the absence of complaints about her job performance between her hiring on June 22, 2020 and September 22, 2020. On September 23, 2020, Gonzalez reported Prohias's sexual harassment. ECF No. [21-10]. Thereafter, Defendant's assessment of her performance began to change based on email communications involving Prohias and Thompson. For example, just over one week later, on October 2, 2020, Prohias began to collect complaints about Gonzalez. *See* ECF No. [21-16] at 2-3. Prohias elicited one such complaint, which concerned Gonzalez's job performance for the "past few weeks" preceding the complaint. *Id.* As previously noted, the record supports that Prohias facilitated Gonzalez's firing and that Prohias continued to exercise a supervisory role over Gonzalez. Given that evidence, and to the extent Spitzer Autoworld's performance-related reasons for Gonzalez's firing are Prohias's reasons for firing her, those reasons are pretextual.

Defendant contends that Prohias was not involved with the decision to terminate Gonzalez's employment and Spitzer Autoworld had legitimate, work performance-related reasons to fire Gonzalez. ECF No. [22] at 3. However, that contention is belied by the record. Even assuming *arguendo* that Prohias was not involved with Gonzalez's firing, Gonzalez has presented evidence to call into question Thompson's sincere belief in the reasons for her firing. For example, in Thompson's notes of Gonzalez's sexual harassment report, Thompson wrote, "9/22 Phil told Kelly that [Gonzalez] is Bitchy." ECF No. [21-10] at 3-6, 8. It is questionable how another employee's negative opinion of Gonzalez is relevant to a sexual harassment report or Defendant's investigation. Second, Thompson testified that Gonzalez "complained about everything." Thompson Decl. 21:3-7. Third, on at least one occasion on October 2, 2020, Thompson asked Prohias to provide her with complaints about Gonzalez. *See* ECF No. [21-16] at 2 ("FYI, as per

your request."). Taken together, those facts, in the light most favorable to Gonzalez, raise a genuine dispute as to whether Thompson's involvement with Gonzalez's termination was based on a sincere belief in Gonzalez's poor performance or a mere pretext.

Based on the foregoing, the Court finds genuine issues of material fact as to the sincerity of Spitzer Autoworld's proffered legitimate reasons for firing her. Gonzalez has thus made the necessary showing of pretext under the *McDonnell Douglas* framework, and summary judgment is not warranted on Counts III, VI and IX.

### C. Counts I and IV: Hostile Work Environment

Spitzer Autoworld seeks summary judgment on Counts I and IV on the grounds that Gonzalez cannot demonstrate a hostile work environment.[9] Specifically, Spitzer Autoworld urges the Court to hold, as a matter of law, that Prohias's conduct did not rise to the level of "altering the terms and conditions of Gonzalez's employment." ECF No. [22] (quoting *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304-05 (11th Cir. 2016)). The Court is not persuaded.

Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment requires proving a subjective and an objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)). In other words, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* (quoting *Harris*, 510 U.S. at 21) (internal quotation marks omitted). In particular, the work environment must be

---

[9] Spitzer Autoworld argues there is no basis for holding it liable for Prohias's harassment because "Plaintiff failed to notify or otherwise alert it of the alleged hostile work environment." ECF No. [22] at 7. The record certainly refutes that argument. To the extent that Spitzer Autoworld argues Gonzalez failed to notify it of harassment after September 22, 2020, there is a dispute as to whether Prohias continued to ask out Gonzalez, so that argument is unavailing at the summary judgment stage.

such that a reasonable person would find it to be hostile and abusive, and the victim of the harassment must subjectively perceive the environment to be abusive. *Id.* Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 118 S. Ct. 998, 1003 (1998)). The Eleventh Circuit has identified the following four factors to be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir. 1997).[10] The Court proceeds to consider those four factors.

Here, the record shows that before the incident on September 22, 2020, Prohias asked Gonzalez out "almost every day," and Gonzalez "kept telling [Prohias] no." Gonzalez Dep. at 27:17-18, 22:21-23:8. The record also shows that Prohias had touched Gonzalez's hand inappropriately, called her "baby," mentioned a dream Prohias had about her, and asked for a couples' massage. ECF No. [21-10] at 3-6, 8. On September 22, 2020, Prohias pulled Gonzalez's left arm towards him, bit one of her breasts, slapped her buttocks "several times," and held her tight as she tried to pull away from him. Gonzalez Dep. at 27:3-15. Gonzalez testified that, after September 20, 2020, Prohias kept asking her out. *Id.* at 34:14-25. The first factor favors Gonzalez because the record shows the harassing conduct was frequent before September 22, 2020, and there is a dispute as to whether it continued afterward. The second factor favors Gonzalez strongly given the severity of Prohias's conduct on September 22, 2020. *See Wood v. Kmart Corp.*, No. 05-60792-

---

[10] Spitzer Autoworld does not dispute that Gonzalez perceived Prohias's conduct to be sufficiently severe and pervasive to alter the terms or conditions of her employment. *See* ECF No. [22] at 9.

CIV, 2007 WL 9698301, at *6 (S.D. Fla. May 24, 2007) (citing *Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998)) (explaining that the plaintiff in *Lockhard*, "a waitress, complained on several prior occasions about harassment from certain patrons. Later, after objecting to waiting on the patrons, she was assaulted by both of them. The patrons pulled her hair, grabbed her breast, and one of the patrons put his mouth on her breast."). In view of the September 22, 2020 incident, the harassment here was more than a mere offensive utterance but rather was threatening and humiliating, so the third factor favors Gonzalez. The fourth factor favors Spitzer Autoworld because Gonzalez continued to work at Spitzer Autoworld from the time of her onboarding until the day of her firing. On balance, this Court is unable to hold, as a matter of law, that a reasonable person in the plaintiff's position could not find that Prohias's conduct was sufficiently severe or pervasive to alter the terms or conditions of Gonzalez's employment.

Spitzer Autoworld's reliance on *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir. 1986), *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir. 1993), and *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998) are misplaced because the harassment here constitutes conduct more severe than the conduct in those cases and Prohias's conduct was not isolated. In *Scott*, a brake mechanic slapped plaintiff on the buttocks, but there was no evidence that the brake mechanic engaged in any other sexually inappropriate conduct where there is evidence that Prohias's unwanted sexual advances were repeated and Prohias bit Gonzalez on the breast. *Scott*, 798 F.2d at 211, 214. Similarly, in *Cruz*, the harassment was isolated and no more severe than in *Scott*. *Weiss* 990 F.2d at 337. Moreover, the conduct here is more severe than in *Quinn* because the harasser there never placed his hands on the plaintiff. *See Quinn*, 159 F.3d at 764 ("Other allegations included the display to Quinn of pornography, the pantomiming of sexual acts, and one instance of Fahey brushing against Quinn's breasts with papers he was carrying.").

Thus, summary judgment is not warranted on Counts I and IV.

**D.  Counts I and IV: *Faragher/Ellerth* Affirmative Defense**

Spitzer Autoworld asserts the *Faragher/Ellerth* affirmative defense bars Gonzalez's claims under Title VII because (1) Spitzer Autoworld did not take a tangible employment action against Gonzalez on account of Prohias's harassment, (2) Spitzer Autoworld took reasonable steps both to prevent sexual harassment and to remedy Prohias's sexual harassment once that harassment was brought to its attention, and (3) Gonzalez failed to utilize any remedial opportunities made available by Spitzer Autoworld. ECF No. [22] at 11. Gonzalez responds that there is no admissible evidence that Spitzer Autoworld took any reasonable steps to remediate Prohias's sexual harassment and Gonzalez availed herself of Spitzer Autoworld's preventive or corrective sexual harassment procedures. ECF No. [31] at 15-17.

In cases where the supervisor's harassment involved no adverse tangible employment action, the Eleventh Circuit has explained that an employer can avoid vicarious liability of a supervisor's conduct by proving the affirmative defense described in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). *Frederick*, 246 F.3d at 1312. An employer establishes the *Faragher/Ellerth* defense if it demonstrates "(a) that it took reasonable steps both to prevent sexual harassment and to remedy the sexually harassing conduct promptly once it was brought to the employer's attention, and (b) that the victimized employee unreasonably failed to avoid harm or utilize any remedial opportunities made available by the employer." *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 422 (11th Cir. 1999). The Court proceeds to analyze the elements of the *Faragher/Ellerth* defense in turn.

**1.  Reasonable Steps both to Prevent Sexual Harassment and to Remedy the Sexually Harassing Conduct Promptly Once It Was Brought to the Employer's Attention**

*a.  Reasonable Steps to Prevent Sexual Harassment*

Spitzer Autoworld submits that it took reasonable steps to prevent sexual harassment by (1) having a written anti-harassment policy "which clearly identified the individuals who should be contacted to make a complaint and made clear that the employee would be protected from retaliation," (2) required every new employee to watch an anti-harassment training video called "Respect in the Dealership" and to take a quiz to demonstrate an understanding of prohibited conduct in the workplace, and (3) required new employees to acknowledge the training in writing and that the employees have read and understood Spitzer Autoworld's policies. ECF No. [22] at 12.

In determining whether an employer has taken reasonable steps to prevent sexual harassment, the Eleventh Circuit has considered whether an anti-harassment policy that strictly prohibits discrimination and harassment was "effectively disseminated." *Cooper v. CLP Corp.*, 679 F. App'x 851, 854 (11th Cir. 2017) (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000) ("[T]he Supreme Court [in *Faragher* and *Ellerth*] implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy.")); *see also White v. Creative Hairdressers Inc.*, No. 11-60723-CIV, 2011 WL 13135655, at *7 (S.D. Fla. Nov. 16, 2011), aff'd, 503 F. App'x 938 (11th Cir. 2013) ("the Court finds Defendant's policy was adequately disseminated").

Here, the record shows that Spitzer Autoworld showed new employees a sexual harassment prevention training video and administered a quiz on Spitzer Autoworld's sexual harassment policies to new hires. ECF No. [21-3] at 31:12-22; *see also* ECF No. [21-6]. The record also shows that Spitzer Autoworld provided Gonzalez with Spitzer Autoworld's written policy regarding how to report sexual harassment, *id.*, and that Gonzalez received and agreed to Spitzer Autoworld's

Non-Discrimination Policy, ECF No. [21-4]. Although those facts do not support that *all* employees received Spitzer Autoworld's sexual harassment policies or received its training on those policies, they do support the inference that Spitzer Autoworld effectively promulgated those policies. Gonzalez does not provide evidence in rebuttal that those policies were ineffectively disseminated to employees. Absent such evidence, there is no genuine dispute that Spitzer Autoworld took reasonable steps to prevent sexual harassment.

### b.   *Reasonable Steps to Remedy the Sexually Harassing Conduct*

In determining whether an employer took reasonable steps to remedy sexually harassing conduct, the Eleventh Circuit considers whether an employee's allegations of sexual harassment are substantiated. *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007). Where allegations are unsubstantiated, the Eleventh Circuit has held that "warning the harasser and counseling him ordinarily is enough." *Id.* at 1306. Here, Prohias "vehemently denied" allegations of sexual harassment. ECF No. [21-11]. Thompson testified that she was unable to substantiate Gonzalez's allegations. Thompson Decl. ¶ 8, ECF No. [21-12]. Thompson further testified Tamara Lowe and Kelly Harrington did not substantiate Gonzalez's allegations of sexual harassment. Thompson Decl. at 33:23-34:15. In addition, the record shows that Spitzer interviewed Prohias concerning Gonzalez's allegations and that Spitzer explained to Prohias that he must not "touch . . . , flirt with, invite out or speak to in any sexual manner any employee of [Spitzer Autoworld]" and must "[f]ollow [Spitzer Autoworld's] policies and federal employment guidelines." ECF No. [21-11]. Under the reasoning in *Baldwin*, such warning and counseling is enough, "at least as a first step." *Baldwin*, 480 F.3d at 1307.

However, the record supports that "the employer's first remedy proved inadequate, and it failed to take further action to correct the problem." *Id.* That is because the parties dispute whether Prohias continued to harass Gonzalez after the incident on September 22, 2020. *Compare* CSMF

¶ 57 (citing Gonzalez Dep. ¶ 34:14-25) with RSMF ¶ 57 (citing Thompson Decl. at 32:3-9; ECF No. [21-15]). Gonzalez testified that Prohias did so. As such, accepting that evidence, Spitzer's warning and counseling were insufficient to remedy Prohias' conduct. Accordingly, there is a genuine dispute of material fact as to whether Spitzer Autoworld took reasonable steps to remedy Prohias's conduct.

Thus, Spitzer Autoworld has failed to satisfy its burden of showing that it is entitled to summary judgment on Counts I and VI on the basis of its *Faragher/Ellerth* defense.

### 2. Unreasonable Failure to Avoid Harm or Utilize any Remedial Opportunities Made Available by the Employer

Because the Court has determined that there is a dispute of material fact as to the adequacy of Spitzer Autoworld's efforts to remediate Prohias's harassment, the Court declines to consider whether Gonzalez unreasonably failed to utilize any remedial opportunities made available by Spitzer Autoworld.

### E. Count VII: Discrimination in Violation of the Americans with Disabilities Act

The ADA prohibits employers from taking adverse employment action "against a qualified individual on the basis of disability." *Lewis v. Georgia Power Co.*, No. 22-11395, 2023 WL 1818924, at *2 (11th Cir. Feb. 8, 2023) (quoting 42 U.S.C. § 12112(a)). "An employer can violate section 12112(a) either by intentional discrimination or by failing to make a reasonable accommodation for an employee's disability." *Id.* (citing 42 U.S.C. § 12112(b)(5)(A) and *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)). "To prevail on her disability discrimination claim under the ADA, Plaintiff must show that: (1) she is disabled, (2) she was a 'qualified individual' when she was terminated, and (3) she was discriminated against on account of her disability. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (citing *Wood v. Green,* 323 F.3d 1309, 1312 (11th Cir. 2003)). A plaintiff's disability discrimination claim under

the FCRA includes the same essential elements. *See Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263-64 (11th Cir. 2007) ("Claims raised under the Florida law are analyzed under the same framework as the ADA.").

The parties agree the *McDonnell Douglas* framework—which the Court described previously—also applies to Count VII. *See* ECF No. [22] at 16; ECF No. [31] at 17-18; *see also Stevenson v. Delta Air Lines, Inc.*, No. 21-13814, 2023 WL 197052, at *5 (11th Cir. Jan. 17, 2023) (applying *McDonnell Douglas* framework to plaintiff's age discrimination claim). The Court therefore considers the parties' arguments regarding each step of that framework.

### 1.  **Plaintiff's *Prima Facie* Case**

Spitzer Autoworld contends Gonzalez cannot establish a *prima facie* case for discrimination on the basis of disability because she is not "disabled" within the meaning of the ADA. ECF No. [22] at 17. Spitzer Autoworld reasons that since Gonzalez's broken foot was a transitory and minor condition, she cannot be "regarded as" having a disability under 42 U.S.C. § 12102. *Id.* at 18. In addition, Spitzer Autoworld asserts it did not know Gonzalez was disabled, so it could not be regarded as discriminating against her on that basis. *Id.* at 19. Gonzalez responds the "transitory and minor" exception to being "regarded as" disabled under 29 C.F.R. § 1630.15(f) does not apply to "actual disabilities" under 29 C.F.R. § 1630.2(g)(1)(i) or § 1630.2(g)(1)(ix). Gonzalez submits that her broken foot substantially limited one or more major life activities, qualifying her as disabled. ECF No. [31] at 19. Gonzalez further contends that she notified Yakich about her broken foot on November 2, 2020, so Spitzer Autoworld knew about her injury. *Id.* at 20.

As stated, a plaintiff must establish the following three elements for a *prima facie* case under the ADA: (1) the plaintiff "has a disability"; (2) the plaintiff is a "qualified individual"; and (3) the plaintiff was discriminated against because of a disability. *Holly v. Clairson Indus., LLC,*

492 F.3d 1247, 1255-56 (11th Cir. 2007). A "disability" includes a "***physical or mental***

***impairment*** that ***substantially limits*** one or more ***major life activities*** of such individual; a record

of such an impairment; or being regarded as having such an impairment . . . ." *Fortun v. iAero*

*Thrust LLC*, No. 21-CV-23348, 2022 WL 446209, at \*3 (S.D. Fla. Feb. 14, 2022) (quoting 42

U.S.C. § 12102(1)(A)-(C)) (emphasis added). A "physical or mental impairment" is

> [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical
> loss affecting one or more body systems, such as neurological, musculoskeletal,
> special sense organs, respiratory (including speech organs), cardiovascular,
> reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic,
> skin, and endocrine; or [a]ny mental or psychological disorder, such as an
> intellectual disability . . . , organic brain syndrome, emotional or mental illness,
> and specific learning disabilities.

29 C.F.R. § 1630.2(h).[11]

Under the regulations amended in light of the ADA Amendments Act of 2008

("ADAAA"), "'substantially limits' shall be construed broadly in favor of expansive coverage, to

the maximum extent permitted by the terms of the ADA." *See Moore v. Jackson Cnty. Bd. of Educ.*,

979 F. Supp. 2d 1251, 1260 (N.D. Ala. 2013) (quoting 29 C.F.R. § 1630.2(j)(1)(i)). In addition,

"[t]he six-month 'transitory' part of the 'transitory and minor' exception to 'regarded as' coverage

in § 1630.15(f) does not apply to the definition of 'disability' under paragraphs (g)(1)(i) (the 'actual

disability' prong) or (g)(1)(ii) (the 'record of' prong) of this section." *Id.*

"Major life activities" include but are not limited to: "caring for oneself, performing

manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,

breathing, learning, reading, concentrating, thinking, communicating, and working." *Fortun*, 2022

WL 446209, at \*4 (citing 42 U.S.C. § 12102(2)(A)).

---

[11] The Eleventh Circuit has endorsed the Code of Federal Regulation's interpretation of impairment.
*See Harris v. H & W Contracting Co.*, 102 F.3d 516, 520 (11th Cir. 1996).

*Moore* is persuasive. The plaintiff in *Moore* asserted that she was substantially limited in the major life activities of "standing, walking, running, and musculoskeletal function." *Moore*, 979 F. Supp. 2d at 1258-59. Because there was no dispute that the plaintiff was required to use assistive devices like crutches, a wheelchair, a walker, and a cane for mobility, the plaintiff's broken ankle at least temporarily limited her major life activities of walking, running, and even standing, and "it certainly limited her musculoskeletal function." *Id.* at 1259. The court found that the plaintiff's ankle injury impairment substantially limited her ability to perform major life activities under 29 C.F.R. § 1630.2(j)(1) because plaintiff required assistive devices. *Id.* at 1260-61.[12]

Here, a provider performed a musculoskeletal exam and found pain "evident with palpation of the right midfoot and distal 3rd digit." ECF No. [30-10] at 2. An x-ray examination indicated "possible 2nd 3rd met base fractures" and "[p]ossible listfranc injury to right foot[.]" *Id.* An "Unna boot" was applied, and the provider recommended that Gonzalez engage in "minimal [weight bearing]" and that she use a posterior splint and crutches. *Id.* In the light most favorable to Gonzalez, the Court concludes that Gonzalez suffered from 2nd and 3rd met base fractures and a listfranc injury to the right foot. These constitute a physiological condition affecting her musculoskeletal system—and therefore a physical impairment—because those injuries imposed a weightbearing limitation. Evidence of the need for Gonzalez to use an Unna boot, a posterior splint,

---

[12] 29 C.F.R. § 1630.2(j)(1) provides, in pertinent part:
(j) Substantially limits—
   (1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:
      (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard. . . .
      (ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

and crutches supports that the injury, substantially limited her ability to walk, stand, lift, or bend. Accordingly, Gonzalez's injury rendered her "disabled" within the meaning of the ADA.

The case on which Spitzer Autoworld relies, *Vargas v. St. Luke's-Roosevelt Hospital Center*, No. 16-CV-5733 (JPO), 2020 WL 2836824 (S.D.N.Y. June 1, 2020), is distinguished by how that court applied the EEOC's interpretation of the ADA to the plaintiff's injury. The court in *Vargas* found that the plaintiff's appendicitis—for which the plaintiff was able to work at "full physical activity" after two months—did not substantially limit the plaintiff's major life activities. *Id.* at *6 (citing 29 C.F.R. § 1630.2(j)(1)(ix) (app.)). *Vargas* reasoned that, because the EEOC regulations stated that a back impairment substantially limits the major life activity of lifting if it results in a 20-pound lifting restriction that lasts several months, the plaintiff's impairment was not substantially limiting because it did not last "several months." In finding that so, the court in *Vargas* implicitly concluded that the plaintiff's impairment, lasting for a short period of time, was not "sufficiently severe" so as to qualify as a disability. *See* 29 C.F.R. § 1630.2(j)(1)(ix) (app.) ("Impairments that last only for a short period of time . . . may be covered *if sufficiently severe*.'") (citing Joint Hoyer-Sensenbrenner Statement on the Origins of the ADA Restoration Act of 2008, H.R. 3195 (reviewing provisions of H.R. 3195 as revised following negotiations between representatives of the disability and business communities) at 5). On the record before it, Gonzalez's "2nd, 3rd metatarsal fractures and [a] Lisfranc injury" are "sufficiently severe" to render her "disabled" within the meaning of the ADA.

## 2. Legitimate Non-Discriminatory Reason for Termination

Spitzer Autoworld contends it terminated Gonzalez's employment for a legitimate and non-discriminatory reason: for rudeness to a customer and to coworkers and for mishandling title paperwork. ECF No. [22] at 19-20. Spitzer Autoworld further asserts that this Court may not second guess Spitzer Autoworld's business judgment in its employment decisions.

As noted, the HR Separation Form states that Gonzalez was fired for her job performance and negative verbal conduct. The HR Separation Form is supported by record evidence indicating Gonzalez's poor job performance and negative verbal conduct. Accordingly, Spitzer Autoworld has offered a legitimate, non-discriminatory reason for Gonzalez's termination.

### 3.  Pretext

The Court has previously determined that Gonzalez has presented sufficient evidence to satisfy her showing that Defendant's reasons for firing her were pretextual. Accordingly, summary judgment is not warranted on Count VII.

### F.  Count VIII: Failure to Accommodate

In seeking summary judgment on Count VIII, Spitzer Autoworld argues in two paragraphs that, because Gonzalez is not disabled, she cannot sustain Count VIII. ECF No. [22] at 21. Alternatively, Spitzer Autoworld contends it did not know of her disability.

The Court reiterates that, "to establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must demonstrate 'that (1) he has a disability, (2) he is a "qualified individual," which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the defendant unlawfully discriminated against him because of the disability.'" *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005). Unlawful discrimination under includes failing to provide "reasonable accommodations" for employees' known disabilities. *Cf. Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022) (applying the standards of title I of the ADA (42 U.S.C. § 12111 *et seq.*) to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a)). An employer must make "reasonable accommodations" to an otherwise qualified employee with a disability, "unless doing so would impose [an] undue hardship." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir.2001) (citing 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. §

1630.9(a)). "An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016). "What constitutes a reasonable accommodation depends on the circumstances, but it may include 'job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position' among other things." *Id.* (quoting 42 U.S.C. § 12111(9)(B)).

The employee has the burden of identifying an accommodation and demonstrating that it is reasonable. *Lucas,* 257 F.3d at 1255-56. If she cannot do so, the employer has no affirmative duty to show undue hardship. *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir. 2000). An employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363-64 (11th Cir. 1999).

Spitzer Autoworld rests its argument in favor of summary judgment on Count VIII on the grounds that Gonzalez is not disabled but makes no argument regarding her status as a qualified individual or on whether it unlawfully discriminated against Gonzalez because of the disability. ECF No. [22] at 21. Gonzalez contends Spitzer Autoworld unlawfully discriminated against her under 42 U.S.C. § 12112(b)(5)(A). ECF No. [31] at 22-23.

The Court has found Defendant has not carried its burden to show there is no dispute of fact concerning whether Gonzalez was disabled. III.E.1, *supra*. Accordingly, summary judgment is therefore denied on this Count.

## IV.    Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, **ECF No. [22]**, is **DENIED**.

Case No. 22-cv-21590-BLOOM/Otazo-Reyes

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 8, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record